**Larry D. RICHARDS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 91–C–1304A.**

United States District Court, D. Utah, C.D.

June 5, 1992.

Loni F. DeLand, Salt Lake City, Utah, for plaintiff.

Wayne T. Dance, Asst. U.S. Atty., Salt Lake City, Utah, for defendant.

**1.** Section 841(a)(1) provides:
Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
  (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance.
21 U.S.C. § 841(a).

## ORDER GRANTING MOTION UNDER 28 U.S.C. § 2255

ALDON J. ANDERSON, Senior District Judge.

Presently before the court is plaintiff's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. On August 10, 1990, based on his plea of guilty to one count of possession with intent to manufacture methamphetamine in violation of 21 U.S.C. § 841(a)(1),[1] plaintiff was sentenced to the custody of the Bureau of Prisons for one hundred eighty-eight (188) months. Plaintiff currently is incarcerated at El Reno, Oklahoma.

The material facts underlying plaintiff's arrest and conviction are as follows. At the time of his arrest, plaintiff was in possession of approximately 8.5 gallons of a liquid mixture in which a detectable amount of methamphetamine was suspended. Statement of Defendant in Advance of Plea of Guilty, Case No. 89–CR–168A, Doc. No. 67 at 5. Plaintiff stipulated that the weight of the liquid mixture was thirty-two kilograms. *Id.* The court sentenced plaintiff according to 21 U.S.C. § 841(b)(1)(A)(viii) and U.S.S.G. § 2D1.1. Section 841(b)(1)(A)(viii) provides that a person whose violation of section 841(a) involves "100 grams or more of methamphetamine … or 1 kilogram or more of a mixture or substance containing a detectable amount of methamphetamine" shall be subject to a minimum mandatory sentence of ten years, a fine of up to $4,000,000, and supervised release of at least five years. Section 2D1.1 of the Sentencing Guidelines requires that a person convicted of possessing with intent to manufacture a controlled substance in amounts of "[a]t least 30 KG but less than 100 KG of Methamphetamine, or at least 3 KG but less than 10 KG of Pure Methamphetamine" shall be subject to a base offense level of 38. U.S.S.G. § 2D1.1(c)(3).[2]

**2.** In his Statement in Advance of Plea of Guilty, plaintiff stipulated that his conduct involved 32 kilograms of a mixture containing methamphetamine base and that such an amount would subject him to a base offense level of 36. Case No. 89–CR–168A Doc. No. 67 at 5.
  However, under the guidelines, in order to qualify for a base offense level of 36, the offense

Of crucial import to this case is the footnote to section 2D1.1(c) of the sentencing guidelines which provides, in relevant part, that "[u]nless otherwise specified, the weight of a controlled substance set forth in the table refers to the *entire weight of any mixture or substance containing a detectable amount of the controlled substance.*" U.S.S.G. § 2D1.1(c) n. * (emphasis added). Despite the agreement of the government and plaintiff that the mixture here involved was not pure methamphetamine base and, in fact, was diluted by other chemicals, the court felt compelled by the above-referenced footnote to sentence plaintiff as if the entire liquid mixture were methamphetamine base.[3] Accordingly, the court applied the base offense level appropriate to the entire weight of the mixture in arriving at its sentence of 188 months.

On December 26, 1991, plaintiff filed the present motion to vacate, set aside, or correct his sentence. The basis of plaintiff's motion is that, in sentencing him, the court erroneously applied the sentencing guidelines. Specifically, plaintiff alleges that the court erred in its calculation of his base offense level because it used the total weight of the liquid mixture containing methamphetamine base. Plaintiff alleges that the 8.5 gallons of liquid mixture in his possession contained only "traceable" amounts of methamphetamine, that the mixture, as of the time of the seizure, was not in marketable, digestible, ingestible, or otherwise usable form, and that the mixture was a toxic by-product left over from the methamphetamine manufacturing

process and of no market worth. Plaintiff argues that the court should have used an "extraction" method whereby the actual amount of marketable methamphetamine should have been removed from the mixture and that amount should have been used as the basis for calculating his base offense level.

The government responds to Plaintiff's motion with four arguments: (1) that plaintiff waived his argument because he failed to pursue it on direct appeal; (2) that plaintiff waived his argument by not including it in a previous post-sentence motion; (3) that plaintiff waived the argument by failing to lodge an objection with the court at the time of sentencing; and (4) that the court properly sentenced plaintiff under the applicable legal rules.[4] Because the court believes that its application of the sentencing guidelines and the relevant legal rules was erroneous in light of subsequent cases construing those rules, it grants plaintiff's motion.

The government relies on *United States v. Dorrough,* 927 F.2d 498 (10th Cir.1991), and *United States v. Callihan,* 915 F.2d 1462 (10th Cir.1990), for the proposition that, when calculating the base offense level for a crime involving possession of a mixture in which a detectable amount of a controlled substance is present, the total weight of the mixture is the proper basis for applying the sentencing guidelines. Both *Dorrough* and *Callihan* stem from the same factual circumstances. In *Callihan,* the defendant entered a plea of guilty

---

would had to have involved "[a]t least 10 KG but less than 30 KG of Methamphetamine, or at least 1 KG but less than 3 KG of Pure Methamphetamine." U.S.S.G. § 2D1.1(c)(4). Because the weight of the mixture involved in the present case exceeded 30 kilograms, the base offense level of 36 was erroneously applied. In light of the court's disposition of plaintiff's motion, it need not and does not address this error.

3. In addition to the footnote to section 2D1.1, the court was guided in its sentencing by the Tenth Circuit cases relied upon by the government in opposition to the present motion and discussed hereafter. *See United States v. Dorrough,* 927 F.2d 498, 502 (10th Cir.1991); *United States v. Callihan,* 915 F.2d 1462, 1463 (10th Cir.1990).

4. The court notes that, of the four arguments asserted by the government in opposition to plaintiff's motion, three are procedural waiver arguments based on plaintiff's failure to raise the issue here presented at the time of sentencing, on direct appeal, or on a previous section 2255 motion.

The court is unpersuaded by these arguments in light of the fact that the cases relied on by the court and discussed herein had not been decided at the time of defendant's sentencing and there would have been no viable legal basis for plaintiff's argument. Plaintiff did not, therefore, waive his opportunity to present his argument. Accordingly, the court will address the government's response only as it relates to the substantive issue presented.

to conspiring to manufacture, possess with intent to distribute, and distribute amphetamine. *Callihan*, 915 F.2d at 1463. At the time of the defendant's arrest, 94 kilograms of a chemical mixture containing phenalytic acid, sodium acetate, acetic anhydride, and phenyl–2–propanone ("P–2–P") were seized. *Id.* When heated, the chemical mixture seized would have produced more P–2–P, a controlled substance and a precursor of amphetamine. However, at the time of the seizure, only 2.95 kilograms of P–2–P were actually present in the mixture. *Id.* The court literally construed the footnote to section 2D1.1 and held that the district court did not err in basing the defendant's sentence on the weight of the entire 94 kilogram mixture rather than on the 2.95 kilograms of P–2–P actually present. *Id.* The court explained that "[t]he footnote meant what it said: that the scale weight of a mixture or compound containing a controlled substance is the entire amount of the mixture or compound." *Id.* (citations omitted).

In *Dorrough*, the defendant was convicted of attempting to manufacture P–2–P and amphetamine and for possession of P–2–P with intent to manufacture amphetamine. *Dorrough*, 927 F.2d at 499. The base offense level for defendant's sentence was based on the same 94 kilogram mixture as was involved in *Callihan*. *Id.* at 502. Rather than arguing that the base offense level should be based on the actual amount of P–2–P present, the defendant argued that the base offense level should be based on the amount of P–2–P that could have been produced from the seized chemicals. *Id.* The defendant specifically argued that the amount of waste material in the mixture should not have been counted for purposes of sentencing. *Id.* The court rejected the defendant's argument and affirmed the sentence relying on both the footnote to section 2D1.1 of the guidelines and *Callihan*. *Id.*

It thus appears that plaintiff's argument that his sentencing should not have been

based on the entire amount of the seized mixture is without legal support in this circuit. However, after both *Callihan* and *Dorrough* were rendered, the United States Supreme Court decided *Chapman v. United States*, —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). There the Court held that, under 21 U.S.C. § 841(b)(1)(B)(v),[5] the weight of blotter paper on which lysergic acid diethylamide ("LSD") was applied and which acted as a carrier medium is to be included in the weight of the controlled substance for purposes of sentencing. *Id.* 111 S.Ct. at 1925–26. Section 841(b)(1)(B)(v) refers to "1 gram or more of a *mixture or substance containing a detectable amount* of [LSD]." The Court held that the combination of blotter paper and LSD formed a mixture or substance and therefore the entire weight of the mixture should be considered under section 841(b). *Id.* at 1926. The Court noted that

> [t]he LSD is diffused among the fibers of the paper. Like heroin or cocaine mixed with cutting agents, the LSD cannot be distinguished from the blotter paper, nor easily separated from it. Like cutting agents used with other drugs that are ingested, the blotter paper, gel, or sugar cube carrying LSD can be and often is ingested with the drug.

*Id.*

At first blush, *Chapman* appears to support the government's reliance on *Callihan* and *Dorrough*. In *Chapman*, however, the Court explained the legislative intent underlying 21 U.S.C. § 841:

> The current penalties for LSD distribution originated in the Anti–Drug Abuse Act of 1986, Pub.L. 99–570, 100 Stat. 3207 (1986). *Congress adopted a "market-oriented" approach to punishing drug trafficking,* under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence. H.R.Rep. No. 99–845, pt. 1,

---

**5.** This section provides that a person convicted of a drug crime involving "1 gram or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD)" shall be subject to a minimum mandatory sentence of 5 years, a fine of up to $2,000,000, and supervised release of at least 4 years. 21 U.S.C. § 841(b)(1)(B).

pp. 11–12, 17 (1986). To implement that principle, Congress set mandatory minimum sentences corresponding to the weight of a "mixture or substance containing a detectable amount of" the various controlled substances, including LSD. 21 U.S.C. §§ 841(b)(1)(A)(i)–(viii) and (B)(i)–(viii). It intended the penalties for drug trafficking to be graduated according to the weight of the drugs in whatever form they were found—cut or uncut, pure or impure, ready for wholesale or ready for distribution at the retail level. Congress did not want to punish retail traffickers less severely, even though they deal in smaller quantities of the pure drug, because such traffickers keep the street markets going. H.R.Rep. No. 99–845, *supra*, at pt. 1, p. 12.

*Id.* at 1925 (emphasis added).

Since the Supreme Court decided *Chapman*, the Sixth, Eleventh and Second Circuits have seized upon the Court's market-based approach in resolving issues under section 2D1.1 of the sentencing guidelines. In *United States v. Rolande–Gabriel*, 938 F.2d 1231 (11th Cir.1991), the Eleventh Circuit held that the weight of an unusable, non-drug solution in which pure cocaine and a cutting agent were suspended was not properly included with the weight of the cocaine and cutting agent for purposes of sentencing. *Id.* at 1238. *Rolande–Gabriel* involved 241.6 grams of a liquid mixture in which 7.2 grams of pure cocaine and 65 grams of a cocaine cutting agent were dissolved. *Id.* at 1233. At sentencing, defendant's base offense level was calculated using the gross weight of the solution. *Id.* In holding that the district court should have based the defendant's sentence only on the weight of the pure cocaine and the cutting agent, the court noted that "the inclusion of the weight of unusable mixtures in the determination of sentences under section 2D1.1 leads to widely divergent sentences for conduct of relatively equal severity." *Id.* at 1235. The court discussed *Chapman* at length, and although it relied on the "market-oriented" approach of *Chapman*, it distinguished the facts of *Chapman* as follows:

In *Chapman*, the LSD and other drugs in carrier mediums considered by the Court were usable, consumable, and ready for wholesale or retail distribution when placed on standard carrier mediums....

While LSD is ready for sale, use, or consumption when it is placed on standard carrier mediums ... the cocaine mixture in this case was obviously unusable while mixed with the liquid waste material. Prior to subjecting the contents of [the defendant's] bags to a chemical extraction process, the cocaine mixture was not ready for retail at the street-level or for wholesale ... The Court stated the inclusion of the weight of standard carrier mediums is rational because standard carrier mediums facilitate the use, marketing and access of LSD and other drugs.... The liquid waste in this case, however, did not accomplish any of these purposes. The inclusion [in] the carrier medium of unusable liquid waste in this case for sentencing is irrational.

*Id.* at 1237. Notwithstanding this factual distinction, the court harmonized its conclusion with *Chapman:*

The distinction we recognize is consistent with the Supreme Court's analysis in *Chapman*. The entire weight of drug mixtures which are usable in the chain of distribution should be considered in determining a defendant's sentence. This case does not conflict with that proposition because [the defendant's] sentence will be based on the gross weight of the *usable* drug mixture in this case.

*Id.* (emphasis in original).

Similarly, in *United States v. Jennings*, 945 F.2d 129 (6th Cir.1991), the Sixth Circuit relied on the market approach articulated in *Chapman* to conclude that a district court erred in basing a sentence on the entire 4180 grams of a mixture only 1.67% of which was methamphetamine. *Id.* at 136. The evidence in *Jennings* consisted of a mixture of chemicals that, at the time of seizure, was "cooking" and that, if allowed to continue cooking, would have reacted to form pure methamphetamine. *Id.*

at 134. The court remanded the case for resentencing with the instruction that the district court rely only on the amount of methamphetamine which could have been produced from the seized chemicals. *Id.* at 137. The court agreed that, ordinarily, the government may assume that the gross weight of a mixture containing detectable amounts of a controlled substance should be included for sentencing. *Id.* at 136. Such an assumption would not, however, be warranted where the subject mixture "contained a small amount of methamphetamine and *poisonous* by-products not intended for ingestion." *Id.* (emphasis in original). The court applied *Chapman* by explaining:

> By diluting the drug with some other substance, the distributor is increasing the amount of the drug he has available to sell to consumers and therefore is appropriately subject to punishment for the entire weight of the mixture. Such is clearly not the case here. If the Crockpot contained only a small amount of methamphetamine mixed together with poisonous unreacted chemicals and by-products, there would have been no possibility that the mixture could be distributed to consumers. At this stage of the manufacturing process, the defendants were not attempting to increase the amount of methamphetamine they had available to sell by adding a dilutant, cutting agent, or carrier medium, but rather were attempting to distill methamphetamine from the otherwise uningestible byproducts of its manufacture.

*Id.* at 137.

Finally, and most recently, in *United States v. Acosta,* 963 F.2d 551 (2d Cir. 1992), the Second Circuit held that the weight of six bottles of creme liqueur in which 2.245 kilograms of pure cocaine were dissolved should not be included in the weight for calculating the defendant's base offense level. *Id.* at 557. In *Acosta,* the gross weight of the liqueur-cocaine mixture was 4.662 kilograms, and the district court, relying on *Chapman,* used that weight for calculating the base offense level. *Id.* at 552. The court acknowledged the "market" approach of *Chapman,* but noted that

[i]n stark contrast to the LSD in *Chapman,* the "mixture" here was useless because it was not ready for distribution at either the wholesale or the retail level. It could not be ingested or mixed with cutting agents unless and until the cocaine was distilled from the creme liqueur. After distillation, it could be sold at the wholesale level or diluted with cutting agents and sold at the retail level. Only at that point, could Congress' rationale for penalizing a defendant with the entire amount of a "mixture" sensibly apply.

*Id.* at 555. Accordingly, the court reversed the imposition of the defendant's sentence and remanded for resentencing. *Id.* at 557.

■ The rule that emerges from the court's review of the decisions in *Chapman, Rolande–Gabriel, Jennings,* and *Acosta* is that, when a detectable amount of a controlled substance is found in a mixture containing unusable, uningestible or poisonous materials that cannot be classified as standard carrier mediums, and the entire mixture is rendered unmarketable because of the contents of the mixture, only the weight of the controlled substance and any standard carrier medium which enhances or facilitates the marketability of the controlled substance should be used for purposes of sentencing.

This position has not been unanimously adopted by the courts that have considered it. A brief review of some of those cases and the reasons proffered for rejecting the rule of *Jennings, Rolande–Gabriel,* and *Acosta* supports this court's application of that rule. The First Circuit has rejected the position of the Sixth, Eleventh and Second Circuits in a series of post–*Chapman* cases. In *United States v. Mahecha–Onofre,* 936 F.2d 623 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991), the defendant was found in possession of two suitcases that were manufactured of an acrylic material into which 2.5 kilograms of cocaine were chemically bonded. *Id.* at 624. The court held that the entire weight of the suitcases, less the weight of the metal components, was the appropriate sentencing considera-

tion under U.S.S.G. § 2D1.1 and 21 U.S.C. § 841(b)(1)(A). *Id.* at 626. The court concluded that *Chapman* dictated that the weight of the suitcases be included for sentencing purposes, and discounted the factual dissimilarities of the two cases:

> Unlike blotter paper or cutting agents, the suitcase material obviously cannot be consumed; and the cocaine must be separated from the suitcase material before use. We do not believe, however, that this fact alone can make a difference to the outcome.

*Id.* Thus, under the First Circuit's analysis, whenever a traceable amount of a controlled substance is present in a "mixture", regardless of the ingestibility, and hence the marketability of the substance, the entire weight of the mixture is the basis for sentencing. This position has been followed by the First Circuit in subsequent cases. *See United States v. Restrepo–Contreras*, 942 F.2d 96, 99 (1st Cir.1991) (entire weight of statues made of beeswax-cocaine mixture properly included for calculation of base offense level); *United States v. Lopez–Gil*, 965 F.2d 1124, 1127–28 (1st Cir.1992) (weight of entire suitcase manufactured of fiberglass-cocaine mixture correctly considered for sentencing). In *Lopez–Gil*, the court specifically considered the rule emerging from *Jennings* and *Rolande–Gabriel* only to conclude that

> [w]e recognize that if this case were before the Sixth or Eleventh Circuit today, the result would be different. We, however, follow First Circuit precedent and affirm the district court's use of the suitcases' weight in calculating [the defendant's] sentence.

*Lopez–Gil* at 1129. The dissenting opinion in *Lopez–Gil* questioned the First Circuit's interpretation of *Chapman:*

> The cocaine was not usable as long as it was mixed with the fiberglass suitcase material. It could not be swallowed, snorted or otherwise absorbed into the body. Further, the record does not show that there was any likelihood that the

fiberglass and cocaine mixture would be sold or that it was even marketable on the retail or wholesale cocaine market, either prior to or after the chemical extraction by [a] DEA chemist.... it makes no physical or legal sense to permit non-usable carrier mediums to play such a determining role in denying a person of his liberty.

*Id.* at 1135 (Brown, J., dissenting).

Similarly, on virtually identical facts as are here involved, the Fifth Circuit held that the entire weight of a waste water solution containing a trace amount of methamphetamine should be used for sentencing under U.S.S.G. § 2D1.1. *United States v. Walker*, 960 F.2d 409, 412–13 (5th Cir. 1992). In *Walker*, the court distinguished *Chapman* because the facts of *Chapman* involved LSD and blotter paper and concluded that *Chapman* was not binding in cases involving liquid solutions. *Id.*, at 412. The court refused to follow *Jennings* and *Rolande–Gabriel* because the Fifth Circuit had previously decided cases [6] holding that the entire weight of waste water containing methamphetamine should be included in sentencing, and the *Walker* court felt compelled to follow that precedent. *Id.* 412 n. 5.

■ With due respect to the First and Fifth Circuits, the court is of the opinion that the better rule, and the rule that would be adopted by the Tenth Circuit were the question before it, is that adopted by the Second, Sixth and Eleventh Circuits. The court disagrees with the First Circuit that the ingestibility of the target mixture is irrelevant to determining marketability, which, under *Chapman* is the crucial factor. Although a mixture containing a controlled substance does not necessarily need to be ingestible to be marketable, if the non-drug portion of the mixture renders the mixture uningestible or unusable without a complicated or obscure chemical or mechanical process, the mixture is not

**6.** The court cited three previous cases. *Walker* at 412 (citing *United States v. Mueller*, 902 F.2d 336 (5th Cir.1990); *United States v. Butler*, 895 F.2d 1016 (5th Cir.1989), *cert. denied,* — U.S. ——, 111 S.Ct. 82, 112 L.Ed.2d 54 (1990); *United States v. Baker*, 883 F.2d 13 (5th Cir.), *cert. denied,* 493 U.S. 983, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989)).

marketable as that term appears to have been used in *Chapman*.

Moreover, unlike the First Circuit in *Lopez–Gil* and the Fifth Circuit in *Walker*, this court is not faced with precedent which compels a result other than that reached.[7] *Dorrough* and *Callihan* involved a precursor chemical presumably having the potential to produce commercially significant amounts of amphetamine. The mixture involved in the present case, however, is alleged to be waste water having only trace amounts of methamphetamine and no apparent commercial worth. More importantly, whereas a mixture containing P–2–P might be marketable even in its precursor state, the waste water found in plaintiff's possession would be unmarketable because of both the toxicity of the mixture and the relatively insignificant amounts of methamphetamine present.

Finally, the court agrees with the dissent in *Lopez–Gil* that the rule requiring drug-related sentences to be based on the gross weight of any mixture containing even a trace amount of a controlled substance will produce inconsistent, arbitrary and inequitable results. The court need look no further than the present facts to envision the case where a truly insignificant amount of controlled substance is present in a large amount of unusable, non-drug material which does not act as a viable carrier medium to enhance marketability. In such cases, under the rule advocated by the government, the defendant will invariably be sentenced according to the weight of the entire mixture. Such a result is arbitrary because it is in no way proportional to criminal culpability, the touchstone of any sentencing scheme. Such a result is inequitable to the defendant who frequently will be punished more severely than other persons who introduce more commercially significant amounts of drugs into society.

Finally, such a result is counterproductive because it requires incarceration, at great public expense, of persons whose criminal conduct does not warrant such severe treatment.

Accordingly, the court believes that, in light of *Chapman* and the cases applying it, the authority relied upon by the government no longer compels the sentence rendered by the court in this case, and will not defeat plaintiff's motion to set that sentence aside. Plaintiff alleges in his motion that the mixture seized at the time of his arrest was "waste water" or the worthless, uningestible and unmarketable by-product of methamphetamine manufacturing. He suggests that the actual amount of methamphetamine present in the mixture was minimal and that his sentence should be based on that amount. To the extent that the seized mixture actually was what plaintiff alleges, he is entitled to have his sentence set aside. Plaintiff's motion in that respect is therefore granted. Plaintiff will be resentenced at a time to be set after consultation with the plaintiff and the government. Pursuant to that resentencing, the court will conduct an evidentiary hearing at which both plaintiff and the government will be invited to present evidence regarding the precise nature and contents of the mixture seized at the time of plaintiff's arrest. For purposes of resentencing, counsel who represented plaintiff at his original sentencing is hereby reappointed.

IT IS SO ORDERED, ADJUDGED AND DECREED.

---

**7.** *But cf. United States v. Killion*, 788 F.Supp. 1165 (D.Kan.1992). *Killion* involved a conviction for manufacturing P–2–P. The defendant was sentenced on the basis of the entire weight of a mixture which included only trace amounts of P–2–P. *Id.* at 1166. On the defendant's section 2255 motion, the court relied on *Dorrough* and *Callihan* to conclude that the entire weight of the mixture should be used for sentencing.

*Id.* at 1166. The court considered, but was unwilling to apply *Rolande–Gabriel* because of "the direct Tenth Circuit pronouncements, which hold definitively that the waste products of the P–2–P manufacturing process are includable in determining a defendant's sentence." *Id.* at 1166. The court did, however, acknowledge that "the reasoning in *Rolande–Gabriel* has some force." *Id.*